**Louise A. DODSON**

v.

**John O. MARSH, Jr., Secretary of the Army.**

**No. IP 84–1451–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 9, 1988.

---

Aaron E. Haith of Choate, Visher & Haith, Indianapolis, Ind., for Dodson.

Harold Bickam, Asst. U.S. Atty., Indianapolis, Ind., for Marsh.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, District Judge.

This is an action brought by Louise A. Dodson, a black female, against John O. Marsh, Jr., Secretary of the Army. The plaintiff alleges that she was a victim of race discrimination in a personnel action at the United States Army Finance and Accounting Center. The action was tried to the Court on November 30, 1987, through December 3, 1987. The Court, having heard all the evidence in this case, now concludes that the defendant is entitled to judgment and the plaintiff can take nothing by her complaint. The Court now enters the following findings of fact and conclusions of law.

### Findings of Fact

#### The Parties

1. The plaintiff, Louise A. Dodson ("Dodson"), is a black female and a citizen of the State of Indiana. At all times material to this case, Dodson was an employee of the United States Army Finance and Accounting Center ("USAFAC"), Indianapolis, Indiana.

2. The defendant, John O. Marsh, Jr., is the Secretary of the Army, and he is being sued in his official capacity.

#### The Complaint

3. On October 29, 1984, Dodson filed her complaint in federal court. The plaintiff claims that she was denied a promotion at USAFAC because of her race and age. The complaint alleges a violation of rights secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 633a, and the Thirteenth and Fourteenth Amendments of the United States Constitution.

4. On June 25, 1986, the Court dismissed all of the plaintiff's claims with the exception of the Title VII claim. *See Dodson v. U.S. Army Finance and Accounting Center*, 636 F.Supp. 894 (S.D.Ind.1986).

5. On November 30, 1987, the Court struck the portion of the plaintiff's complaint that alleged malicious intent. The Court also struck the plaintiff's prayers for punitive damages, injunctive relief, and reinstatement.

#### The Lead Personnel Clerk Position

6. The Lead Personnel Clerk is a position within the Technical Services Offices of the Human Resources Directorate, USAFAC. Velma Newhouse ("Newhouse"), the Chief of the Technical Services Office, created the position in 1978.

7. The Lead Personnel Clerk advises and trains lower-graded Personnel Clerks within the Technical Services Office. The Lead Personnel Clerk must have specialized knowledge of personnel automated computer systems and Federal and Army personnel regulations. The Lead Personnel Clerk most frequently works with two personnel automated computer systems: the Standard Civilian Personnel Management Information System ("SCIPMIS") and the Civilian Personnel Information System in Washington, D.C. ("CIVPERSINS").

8. The first Lead Personnel Clerk was Fannie Reese, a black female.

**A Vacancy in the Lead Personnel Clerk Position**

9. In May 1981, the position of Lead Personnel Clerk became vacant when the incumbent, Mrs. Peterson, was reassigned.

10. From May 1981 to October 4, 1981, Mrs. Peterson and Bethanie McHenry ("McHenry") of the Technical Services Office divided the responsibilities of the Lead Personnel Clerk so that the position continued to function. Mrs. Peterson worked on computer data cards at home at night during the vacancy period. McHenry, who was already training two GS3 clerks in personnel, distributed reports to various offices.

11. An action to recruit qualified applicants for the Lead Personnel Clerk position was not commenced until September 4, 1981. The delay was a result of a number of factors, including: critical employee losses in the division, heavy workload in the division, and the training requirements for new employees by reason of the changes in the regulatory requirements of the Technical Services Office.

12. Newhouse decided that she needed an acting Lead Personnel Clerk until she could fill the position permanently. She decided to temporarily promote McHenry to the position effective October 4, 1981, since McHenry possessed the necessary knowledge, skills and technical expertise to perform the SCIPMIS and CIVPERSINS computer database procedures.

13. "Detailing" is the management practice of temporarily assigning persons to positions pending permanent staffing. The Office of Personnel Management has recognized in regulations that management needs the flexibility to temporarily place employees in vacant positions pending the ultimate staffing for those positions. The Office of Personnel Management requires that no detail can exceed 120 days.

14. McHenry was detailed to the position of Lead Personnel Clerk since she was the most qualified Personnel Clerk in the Technical Services Office when the position became vacant. Newhouse did not look outside the department for someone to detail to the position since a person from outside the department would have to be trained to perform the technical functions of the position.

15. The Lead Personnel Clerk position was advertised in a vacancy announcement dated October 29, 1981. The announcement was amended on November 20, 1981. Newhouse opened the announcement of the vacancy to a broad base of potential applicants. This was not necessary, but Newhouse was not certain that anyone in her department possessed the leadership skills necessary for the position. Moreover, Newhouse had learned that there were individuals on the base who had recently returned from Europe and possessed the necessary skills and knowledge of the SCIPMIS and CIVPERSINS computer database procedures.

**The Selection of a New Lead Personnel Clerk**

16. Eight persons applied for the Lead Personnel Clerk position. A committee referred four of them to Newhouse as "well-qualified" for the job. Among these candidates were McHenry and plaintiff Dodson.

17. Newhouse did not conduct any interviews. Instead, she created a spread sheet to evaluate the candidates. The spread sheet had each candidate's name across the top of the sheet and the five major selection criteria down the far left margin of the sheet. Newhouse used a point system to judge how well the candidate met each of the five criteria. The point system was derived from a pamphlet distributed to the U.S. Army and entitled "Selection and Interview Techniques Booklet." To evaluate the candidates, Newhouse used the information provided by the candidates themselves and the information in the candidates' Official Personnel Files.

18. Newhouse used the following selection criteria to evaluate the candidates.

(1) current knowledge of SCIPMIS;

(2) current knowledge of CIVPERSINS;

(3) current knowledge of Federal Personnel Manual 296–31; and

(4) knowledge to perform quality review/audit of personnel actions.

Newhouse also assigned points for the evaluation the candidate received from his or her supervisor on the candidate's current ability to handle the responsibilities of the Lead Personnel Clerk position. Newhouse chose these criteria pursuant to the recommended selection procedure established for the USAFAC. Under the procedure, supervisors are advised to analyze the vacant position and decide which major duties are most critical to the position. The supervisor then must determine what levels of experience and knowledge are required to perform the major duties.

19. The spread sheet which Newhouse used to select the new Lead Personnel Clerk was not a test. Rather it was a sterile selection process based on experience and knowledge. There was no reference in the selection process to race or to subjective criteria such as personality or leadership skills.

20. McHenry received the highest score of the four candidates on the spread sheet. Plaintiff Dodson received the lowest score. McHenry possessed current knowledge of both the SCIPMIS and CIVPERSINS computer database procedures. As a personnel clerk in the Technical Services Office since May 1977, McHenry had developed the skill to properly program the computer systems to allow the Technical Services Office to code the various personnel actions within the agency. McHenry also possessed a working knowledge of Federal Personnel Manual 296–31 which related to personnel regulations necessary to perform the Lead Personnel Clerk position. Plaintiff Dodson, on the other hand, had no prior personnel clerk experience with the Federal Government. She had not worked in civilian personnel in the U.S. Army, and her only personnel experience was as the recruiting officer for minorities in a private sector corporation. Plaintiff Dodson had no knowledge of the SCIPMIS and CIVPERSINS computer database procedures. Additionally, plaintiff Dodson did not possess a working knowledge of Federal Personnel Manual 296–31.

21. McHenry was officially promoted to the position of Lead Personnel Clerk, GS–203–6, on December 27, 1981.

22. Newhouse did not use the temporary promotion process to provide McHenry with an unfair advantage in the final selection process. Although McHenry may have gained some additional experience and knowledge while detailed to the Lead Personnel Clerk position, the additional skill she obtained was not the deciding factor in selecting McHenry for the position. McHenry had performed personnel clerk functions within the Technical Services Office since May 1977. Moreover, during the 84 days that McHenry was detailed to the Lead Personnel Clerk position, she did not perform all of the functions of the position. She only performed those duties that she had already performed previously during the vacancy period. The temporary promotion permitted her to be paid for what she was already doing during the vacancy period.

23. Newhouse did not know the race of plaintiff Dodson at the time of the selection process. Dodson testified at trial that Newhouse indicated to her that a black person would not get the job. Newhouse denied that she made the statement, and the Court finds Dodson's testimony on this point not credible.

## Conclusions of Law

Based on the foregoing findings of fact, the Court now makes the following conclusions.

1. The Court has jurisdiction over the parties and the subject matter of this action. 28 U.S.C. § 1331.

2. Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment on the basis of race. 42 U.S.C. § 2000e–2(a). There are two theories by which a plaintiff can establish racial discrimination under Title VII: "Disparate treatment" or "disparate impact."

3. The plaintiff has not established a disparate impact claim under Title VII. The plaintiff did not prove that a facially neutral test or rule had an adverse impact on black candidates.

4. At trial, the plaintiff tried to establish a disparate treatment claim under Title VII. Recently, in *Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir.1987), the Seventh Circuit Court of Appeals articulated the framework for analyzing a disparate treatment claim:

> To establish a claim for race discrimination under Title VII ... plaintiff must show that she was the victim of intentional discrimination. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 510 (7th Cir.1986). Under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),
>
> > the plaintiff [first] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
>
> *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).
>
> As for the initial burden of proving a prima facie case of race discrimination we
>
> > explained in a recent decision that the plaintiff can establish a prima facie case of discrimination by demonstrating that he or she is a member of a protected class, that he or she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from the members of the unprotected class.
>
> *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985).

5. The plaintiff never established a prima facie case of discrimination. The plaintiff is a member of a protected class since she is black. However, the plaintiff was not otherwise similarly situated to the members of the unprotected class who applied for the Lead Personnel Clerk position or who could be detailed to the position. She did not have the knowledge and experience of civilian personnel procedures that the other candidates possessed. The facts of this case do not give rise to an inference of discrimination.

6. The plaintiff cannot prove that she was a victim of discrimination in the selection of a Lead Personnel Clerk or in the detailing of the position when the selecting official did not even know the plaintiff's race. *See, e.g., Robinson v. Adams*, 830 F.2d 128, 129 (9th Cir.1987) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race.").

7. Even though the plaintiff did not establish a prima facie case, the defendant proved a legitimate nondiscriminatory reason for the selection of McHenry over plaintiff for the Lead Personnel Clerk position. The defendant proved that McHenry was more qualified for the Lead Personnel Clerk position than Dodson.

8. If any of the above conclusions of law shall subsequently be determined to constitute a matter of fact rather than a conclusion of law, they shall be treated as having been determined as a finding of fact. If any of the above findings of fact shall subsequently be determined to be a conclusion of law, they shall be treated as having been determined as a conclusion of law.

9. The preponderance of the material and credible evidence establishes that plaintiff did not carry her burden of proving race discrimination under Title VII. Judgment on all claims will be entered against the plaintiff and in favor of the defendant.